## IN THE MATTER OF THE ELECTION FOR DIRECTORS OF DELAWARE RIVER AND ATLANTIC RAILROAD COMPANY.

Submitted December 6, 1907—Decided February 24, 1908.

1. Whether, after the formal dissolution by proclamation of a corporation for failure to pay state franchise tax, its directors as trustees have power to vote stock of other corporations owned by the defunct corporation, *quære.*
2. But if in such case a majority of the directors execute a proxy to vote such stock, the revocation of such proxy by part of such majority sufficient to reduce the remainder to a minority will render the proxy invalid.
3. At a corporate election it appeared that the General Construction Company was not entered as a stockholder on the list furnished to inspectors of election; tnat all stock ever issued to it had either been transferred or returned and the certificates refastened to their stubs in the stock book, and it did not appear that there was any transfer book kept. *Held,* that the inspectors should not have recognized the General Construction Company as a stockholder, and that a challenge of the right of said company or its directors to vote at such election should have been sustained.

On application to set aside election of directors of a corporation.

Before Justices GARRISON, REED and PARKER.

For the petitioner, *Lewis Starr*.

For the respondents, *Frederick A. Rex*.

The opinion of the court was delivered by

PARKER, J.   Upon a summary hearing under section 42 of "An act concerning corporations," Revision of 1896 (*Pamph. L., p.* 277), the affidavits and proofs of the parties present the following facts:   The Delaware River and Atlantic Railroad Company is a corporation of New Jersey, organized for the purpose of constructing and operating a railroad across the State of New Jersey.   Its original capital was one hundred and twenty thousand shares of a par value of $50 each, making a total capital of $6,000,000.   For the purpose of constructing its road the company made a contract on June 30th, 1899, with another corporation of this state, called "The General Construction Company of New Jersey," whereby it was agreed that the "Construction Company," as it will be herein called, should build and complete, construct and equip the railroad in question, with everything pertaining thereto to make it a first-class, high-speed, third-rail electric railroad, complete in every respect, and in running order, to transport freight and passengers between Gloucester City and Atlantic City.   The compensation of the Construction Company was to be the entire capital stock of the railroad company, to be delivered to the Construction Company immediately upon the execution of the agreement.   The contract further provided that the Construction Company should begin the building of the road within two years, and continuously prosecute the work, and in case of its failure to do so, the railroad company, on sixty days' written notice, might terminate the contract, and either finish the work itself or make another contract for that purpose, and that in such case the Construc-

tion Company would be entitled only to an "amount of stock proportioned to the amount which the work performed should bear to the whole work to be done."

. It does not appear how much work the Construction Company did under this contract, or, in fact, that any work was done. The railroad company, however, in pursuance of the contract, issued to the Construction Company one hundred and seventeen thousand nine hundred and twenty shares, being all the capital stock except two thousand and eighty shares, which was the total subscribed by the incorporators. From time to time the Construction Company transferred some of the shares held by it to other parties, until in August, 1903, it held one hundred and twelve thousand three hundred and fourteen shares of stock.

At this latter time a new deal was proposed and carried out in the following manner: The railroad company determined to make another contract with another construction company, called "The Delaware River and Atlantic Construction Company," but could not do this with the original contract standing in the way. Accordingly the railroad company served notice on the old Construction Company of rescission of the original contract. The General Construction Company replied, accepting the rescission, and agreeing to the cancellation of the contract and of all obligations created thereby. Then the railroad company made a demand on the Construction Company for the return of the stock held by said company, on account of the contract not having been performed and having been formally rescinded, and the secretary and treasurer of the Construction Company sent back the stock, which was embraced in two certificates, to the secretary of the railroad company, and the certificates were inserted in the stock book from which they had been originally taken. Next the railroad company made a new contract with the new construction company for the construction of its road in substantially the same manner, including equipment, rolling stock, &c., this time for $10,000,000, in five per cent. gold bonds, $7,500,000 in cumulative preferred stock, and $9,400,000 in full-paid common stock.

So far the relations between all the parties seem to have been pleasant and cordial. All the meetings necessary to authorize these transactions were held in regular form, without any dissenting voice, and evidently in pursuance of a carefully prearranged program. The railroad company would hold a meeting requiring action by the Construction Company and then adjourn. The Construction Company would immediately hold the required meeting in the same room and adjourn to make way again for the railroad company to hold a further meeting, if desired. Matters remained in *statu quo* for about four years, until the early fall of 1907, when, in anticipation of a stockholders' meeting of the railroad company to be held on October 15th, 1907, the directors of the original Construction Company seem to have determined to control that meeting. The charter of the General Construction Company had been declared forfeited and made void by executive proclamation, for non-payment of taxes, in January, 1904, and the two years allowed by law for paying up the delinquent taxes and resurrecting the company had expired, so that it was definitely and finally dead for all purposes except those excepted in the statute, namely, prosecuting and defending suits, settling and closing its affairs, and disposing of and conveying its property, and dividing its capital (*Pamph. L.* 1906, *p.* 295, § 53), and under section 54 of the act the directors became trustees, with the powers specified in that section and in the following section.

On the assumption, or under the claim that those powers included the right to vote any stock which the defunct company might own in other corporations, three of the five directors held a meeting and executed a paper-writing in the general form of a proxy, and also another paper of which the following are copies:

"Know all men by these presents, that the General Construction Company of New Jersey does hereby appoint William J. Thompson to be its substitute and proxy for it and in its name and behalf to vote at all stockholders' meetings of said company, and all other meetings of the stockholders of the said company, as fully as it might or could were it personally present.

"In witness whereof, we have hereunto set our hands and seal this eleventh day of September, 1907.

"CHAS. T. MOLONY,
"Z. P. BOYER, JR.,    [L. S.]
"Witnesses present:      "WM. J. THOMPSON.
"JOHN HARRIS."

"Whereas, the charter of the General Construction Company, a corporation under the laws of New Jersey, was in due form of law declared null and void on the fifth day of January, 1904; and whereas, the said General Construction Company was the holder of 112,314 shares of the stock of the Delaware River and Atlantic Railroad Company of New Jersey; and whereas, under the laws of the State of New Jersey, the board of directors of the General Construction Company are the trustees for the stockholders of the said company, be it therefore resolved by the undersigned that we, the board of directors of the General Construction Company, authorize and empower William J. Thompson, of Gloucester City, New Jersey, to vote said stock of said railroad company at any and all stockholders' meetings upon any and all subjects, matters or questions whatsoever that may come before said stockholders' meetings.

"Dated September 11, 1907.

"CHAS. T. MOLONY,
"Z. P. BOYER, JR.,
"WM. J. THOMPSON."

Subsequently Mr. Boyer, one of those who executed the above papers, executed and presented, at the election, another paper purporting to be a revocation of any proxy by him made on the above occasion in the following form, said paper offered in evidence and marked "Exhibit 6," and reads as follows:

"GLOUCESTER, Oct. 15, 1907.

*"To William J. Thompson:*

"I hereby revoke proxy given you, dated Sept. 11, 1907, in connection with Chas. T. Molony, and William J. Thompson.

to vote stock of Delaware River and Atlantic Railroad Co., alleged to be owned by General Construction Co. of N. J. Witness my hand and seal Oct. 15, 1907.

"Witness,                            "Z. P. Boyer, Jr.   [L. S.]

"Lewis Starr."

Notwithstanding this revocation, Mr. William J. Thompson appeared at the meeting of the railroad company's shareholders, on October 15th, and claimed the right to vote one hundred and twelve thousand three hundred and fourteen shares at the election of directors then held. A list of the stockholders had been regularly made out and furnished to the inspectors of election, which list did not show the General Construction Company as the holder of any shares of stock. The stock books of the railroad company were also produced at said election, and it appeared that one of the certificates, No. 73, for thirteen shares, was attached to its stub in the book, and the other one for one hundred and twelve thousand three hundred and one shares, either attached to its appropriate stub or in such condition as to indicate that it had been attached and subsequently detached, the marks of the fastening being apparent, and what is more important, both certificates were in the possession of the officers of the railroad company. Notwithstanding these facts, and in the face of the revocation above referred to and of a challenge of the votes, the inspectors accepted the alleged proxies and permitted Mr. Thompson to cast one hundred and twelve thousand three hundred and fourteen votes for a board of directors supported by him, and thereby control the election, the inspectors declaring the Thompson board to have been elected.

The validity of this alleged election is the question presented to us for review, under section 42 of the Corporation act of 1896, and we are clearly of opinion that the election cannot stand, and for several reasons. In the first place, we doubt whether the three directors of the defunct company had any legal right, as part of the powers conferred upon them by the statute already referred to, to vote the stock of that

company under the circumstances. But if so, and if the papers purporting to be proxies were in proper form as such (and one of them certainly was not), the revocation of Mr. Boyer would seem to destroy their efficacy, because they then became the act of only two of the directors, out of the five, being less than a majority. In the third place, we think, as a matter of fact, that the General Construction Company was not the owner of the stock in question, and this was fully recognized as a fact by everyone concerned for about four years, during which time the Construction Company's charter had been annulled. And in the fourth place, the fact that these shares of stock were not listed on the shareholders' list furnished to the inspectors, the interposition of the challenge and the condition of the stock book all showed, or should have shown to the inspectors that, so far as the records of the corporation were concerned, the General Construction Company was not a shareholder and therefore not entitled to vote. The inspectors were bound by the stock and transfer books. *Corporation Act of* 1896, § 40.

For these reasons the election must be set aside and a new election will be ordered.